**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **BOBBY TATUM, K69478,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **C/O HUNTER,** | ) | **Case No. 22-cv-2411-DWD** |
| **LT. BRADFORD,** | ) | |
| **ASHLEY O'NEAL,** | ) | |
| **VICTORIA KORSCHGEN,** | ) | |
| **WARDEN GALLOWAY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Bobby Tatum, an inmate of the Illinois Department of Corrections (IDOC) filed this action alleging several violations of his constitutional rights under 42 U.S.C. § 1983 at Shawnee Correctional Center (Shawnee). (Doc. 14). The Court allowed Tatum to proceed on a single claim of excessive force, a claim concerning deliberate indifference to resulting injuries, and a claim asserting that the events involved retaliation. (Doc. 16). Defendant Hunter has been on military leave for the entirety of this litigation and has not yet been served. Defendants Korschgen and O'Neal, two nurses subject to the deliberate indifference claim, have appeared by counsel. Defendant Bradford, subject to the deliberate indifference and retaliation claims, has also appeared by counsel. Now before the Court there are countless motions to resolve. The Court will begin with the discovery

motions and miscellaneous motions, and it will then turn to the merits summary judgment motions and responses.

**Discovery & Miscellaneous Motions**

On November 13, 2025, Plaintiff filed a motion to compel wherein he sought responses to interrogatories and camera footage. (Doc. 168). He alleged there was handheld camera footage, footage outside the cell where he alleged Hunter assaulted him (seg 1), and footage from the hallway and dayroom depicting his interaction with nurses. (Doc. 168 at 1-2). He also indicated that Defendant Bradford had yet to respond to his interrogatories despite extensions of the response deadline. (*Id.* at 1). The next day, Defendants Korschgen and O'Neal filed a Motion for an Extension (Doc. 169) alleging that they were also still awaiting video footage promised by Bradford's counsel, and that they needed additional discovery time in case the footage revealed further avenues of discovery to pursue related to this case. The Court deferred ruling, extended the discovery deadline to January 17, 2026, and directed Bradford's counsel to provide an update on the materials the parties sought by December 1, 2025. (Doc. 170).

On November 26, 2025, before Bradford's counsel responded as directed by the Court, Plaintiff filed a Motion for Sanctions or Default. (Doc. 171). In the Motion for Sanctions, Plaintiff alleges that Bradford initially indicated at docket entry 165 that he would produce videos, but that Bradford failed to produce video footage. Plaintiff argues the lack of production provides a basis for default judgment against Bradford. Plaintiff attached Bradford's answers to some of his requests for admission, and he also attached documents that purport to be emails concerning a grievance he filed about the June 22,

2022, incident. One of the emails indicates surveillance cameras were on during the incident, and a tactical video camera was used during the de-escalation, but the tactical camera was not used during Plaintiff's subsequent strip search. (Doc. 171 at 10). Plaintiff highlights that in Bradford's response to a request for admission, where he stated that he "denies the attempt to treat was captured on video[.]" (Doc. 171 at 5).

On December 1, 2025, Defendant Bradford filed a response (Doc. 172) indicating that video footage had been produced to all parties, and that interrogatory responses would be provided within approximately a week. Plaintiff objected (Doc. 173), seemingly arguing that he believes the video footage was altered or "spoiled" and that not all footage was preserved. In support of the objection, Plaintiff tendered Bradford's response to his request for production wherein Bradford indicated that on December 1, 2025, he shared two video files, he is no longer employed by IDOC, and the footage he supplied in this case was all the footage that counsel received when a proper request was made to IDOC for relevant footage. (Doc. 173 at 7-8).

The discovery deadline lapsed on January 17, 2026, without further motions or filings from either side. On January 27, 2026, Plaintiff filed a motion for status on the sanctions issue. (Doc. 174). Plaintiff's Motion for Status (Doc. 174) is granted by the issuance of this Order.

Given the series of events that unfolded surrounding the motions, the Court is not convinced that there is any basis to compel the production of further evidence, nor is there a basis to award sanctions. Federal Rule of Civil Procedure 34(b)(2)(E) requires a party to produce electronically stored information in the format in which it is reasonably

kept. Bradford indicated in his filing to the Court on December 1, 2025 (Doc. 172) and in response to Plaintiff's request for production (Doc. 173 at 7-8) that he supplied all the footage he received from IDOC as relevant to this lawsuit. Thus, the Court finds that Bradford discharged the issue presented by the Motion to Compel (Doc. 168) and the motion is denied.

This still leaves the issue of sanctions, initially presented by Plaintiff *before* he apparently got the video footage (Doc. 171), and enhanced by an "objection" to the discovery he ultimately received (173). The motion for sanctions argues that Bradford initially claimed there was video footage and then indicated in response to requests for admission that there was not footage of the medical treatment offered and denied. (Doc. 171 at 1-2).

Federal Rule 37(e) provides that if there is electronically stored information that should have been kept for litigation, but a party failed to take reasonable steps to preserve it, then sanctions may be warranted. Sanctions can include dismissing the action or entering default judgment. Fed. R. Civ. P. 37(e)(2)(C). The remedial terms of Rule 37(e) apply only where five initial elements are satisfied: (1) the evidence in question must be electronically stored information ("ESI"); (2) a duty must have arisen, generally, to preserve ESI; (3) the specific ESI in question must be relevant, such that it would be subject to that duty; (4) the ESI must have been lost because of a failure to take reasonable steps to preserve it; and (5) restoration or replacement of the ESI must be impossible. *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 619-22 (N.D. Ill. 2022). "When a party is aware of an accident that it knows is likely to cause litigation, it triggers

the party's duty to preserve evidence." *Freidig v. Target Corp.*, 329 F.R.D. 199, 207 (W.D. Wis. 2018) (collecting cases in support of conclusion that duty to preserve was triggered after customer, who slipped in a checkout lane, filled out accident report). "The scope of the duty to preserve includes ESI that is expected to be relevant and proportional to the claims or defenses in the litigation." *Hollis*, 603 F. Supp. 3d at 619.

A key to considering sanctions for an ESI violation requires a demonstration by a preponderance of the evidence that the missing footage existed in the first place. *See White as Independent Administrator of Brown v. Powell*, 2026 WL 1091717 at * 5-6 (N.D. Ill. Apr. 22, 2026). As a court explained,

> "For spoilation 'sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence actually existed and was destroyed.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, 341 F.R.D. 474, 493 (S.D.N.Y. 2022) (quoting *Farella v. City of New York*, Nos. 05 Civ. 5711 & 05 Civ. 8264 (NRB), 2007 WL 193867 at *1, 2007 U.S. Dist. LEXIS 7420 at *2 (S.D.N.Y. Jan. 25, 2007)). And "speculative assertions as to the existence of [evidence] do[es] not suffice to sustain a motion for spoilation of evidence." *Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F.Supp.2d 161, 177 (E.D.N.Y. 2007).
>
> Proof of a negative isn't easy. As Magistrate Judge Paul Cleary noted, "it is difficult to prove [evidence] existed but has been destroyed; however, frequently a missing [piece of evidence] will be referred to in other surviving documents or will be recalled during deposition." *Pinstripe, Inc. v. Manpower, Inc.*, No. 07-CV-620-GKF-PJC, 2009 WL 2252137 at *4, 2009 U.S. Dist. LEXIS 66422 at *11 (N.D. Okla. July 28, 2009). This threshold must be cleared however—as is the default in all civil litigation—by a preponderance of the evidence. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47, 145 S.Ct. 34, 220 L.Ed.2d 309 (2025).
>
> The preponderance standard isn't onerous, but it's also not toothless. *Jetel v. Jetel*, No. 25-cv-50329, 2025 WL 3043527 at *3 n.4, 2025 U.S. Dist. LEXIS 215011 at *10 n.4 (N.D. Ill. Oct. 31, 2025); *United States v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999).

*Id.* at 5. In *White,* a court concluded that defendants should not be sanctioned for the lack of dash cam footage because although there was evidence that by company policy a tractor trailer should have had a dash cam, there was also physical evidence suggesting no camera was present in the truck involved in the accident. *Id.* at 5-6. The court reasoned that given the competing evidence, the simplest explanation that no camera existed was the best, and thus sanctions for the lack of a video were not imposed. *Id.* at 6.

As to intent under Rule 37(e)(2), which is difficult for a party to prove and for a court to find, it is almost always proven with circumstantial evidence. *Hollis*, 603 F. Supp. 3d at 623 (collecting cases). To apply here, the video footage must be "deleted ... with 'the intent to deprive another party of the information's use in the litigation,'" meaning there must be "actual evidence of intent." *Freidig v. Target Corp.*, 329 F.R.D. 199, 210 (W.D. Wisc. 2018); *see also* *Schmalz v. Village of North Riverside*, No. 13-cv-8012, 2018 WL 1704109, *4 (N.D. Ill. March 23, 2018) (noting "[a] finding of negligence, or even gross negligence, would not satisfy the intent requirement under subsection (e)(2)"). If there is evidence of an intent to deprive, the Court may order an adverse inference instruction under Rule 37(e)(2)(B). *Pable v. Chicago Transit Autho.*, 2023 WL 2333414, *18 (N.D. Ill. Mar. 2, 2023) (quoting *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 958 (C.D. Ill. 2021)); *see also* Schmalz, 2018 WL 1704109, *4 (noting an adverse inference instruction "requires a finding of intent" and is "one of the most severe sanctions").

In this case, the Court confronts two issues—does any additional video footage exist beyond what Bradford has produced, and if it does, did Bradford intentionally deprive Plaintiff of the footage. On the first question, Plaintiff argues that footage existed

outside of his initial cell, from a handheld camera, and from cameras near the segregation shower where he was allegedly stripped and interacted with Bradford, Korschgen, and O'Neal. He supports his position by an internal prison email written when a response to his grievance was being prepared wherein a prison employee said there was surveillance footage and footage from a tactical camera. (Doc. 171 at 10). The email indicates the tactical camera footage ended before Plaintiff was stripped. This information does not establish beyond a preponderance of the evidence that there was more video footage than what Plaintiff received. Bradford's counsel indicated in response to a request for production that Plaintiff was provided with two video files. (Doc. 173 at 7). This statement suggests that Bradford produced the footage identified in the email Plaintiff tendered at document 171. But even if there was additional surveillance footage, Plaintiff has not established that Bradford *intentionally* withheld it to frustrate this litigation. Without intentional misconduct, the extreme sanction of default judgment (or even the lesser sanction of an adverse jury instruction) is not appropriate.

In sum, Plaintiff's Motion to Compel (Doc. 168), and his related Motion for Sanctions (Doc. 171) are denied. By contrast, Defendants' related Motion for an Extension (Doc. 169) and Plaintiff's Motion for Status (Doc. 174) are granted instanter.

In addition to the motions about video evidence, Plaintiff filed a subsequent Motion to Compel (Doc. 185). In the Motion (Doc. 185), Plaintiff faults Defendants O'Neal and Korschgen for using spoiled or falsified medical records to support their motion for summary judgment but he does not clearly explain what about the records is improper. Despite the lack of clarity, O'Neal and Korschgen responded that to the best of their

understanding, Plaintiff is simply attacking the existence of duplicate records that got produced by their counsel as well as Defendant Bradford's counsel. (Doc. 189). Defendant Bradford provided a substantively similar response, indicating the only difference in the records is the labels affixed by counsel for litigation. (Doc. 195). Defendants' responses are well taken, and Plaintiff's Motion (Doc. 185) is denied. Plaintiff filed a "response" seeking a live video hearing to test the veracity of the medical records in question, but the Court finds this unnecessary as the records are self-explanatory and the only difference is the "bates" labels commonly affixed by parties for the purpose of litigation. Plaintiff argues in a second response that all of the medical records tendered are out of order, and thus as a sanction default judgment should be granted in his favor. (Doc. 196). The Court finds this line of argument unsupported, and sanctions are unwarranted.

In yet another Motion to Compel (Doc. 191), Plaintiff simply seeks a ruling on his earlier discovery motions, so this Motion (Doc. 191) is granted instanter by the issuance of this Order. And in a Motion for Sanctions (Doc. 197) he seeks default judgment against Defendant Hunter for failing to update his military leave status in the last 60 days. Counsel responded that Hunter is now expected to be on military leave through March of 2028, so the Court finds no basis to impose sanctions. (Doc. 201). Plaintiff's Motion (Doc. 197) is denied.

In addition to the foregoing motions, on March 19, 2026, Plaintiff filed a Motion for Status (Doc. 187) asking if the Court had received his summary judgment responses. Plaintiff's responses were received, so the Motion (Doc. 187) is granted instanter.

Finally, Defendants' Korschgen and O'Neal moved to strike (Doc. 188) what they characterize as a sur-reply (Doc. 184) to their reply (Doc. 183) on their motion for summary judgment. While it is true that Plaintiff appears to have filed two responses to their motion for summary judgment (Docs. 181, 184) the first is really a further attempt to pursue discovery issues and the second brief (Doc. 184) is Plaintiff's more merits-based response. Plaintiff is a pro se litigant, and his second response promotes a more thorough consideration of the merits, so the Court will deny the Motion to Strike (Doc. 188) and it considered Plaintiff's response (Doc. 184).

On June 18, 2026, after the motions for summary judgment had been filed and after Plaintiff filed his responses, Plaintiff lodged a Motion for Appointment of Counsel (Doc. 200), which is his seventh motion for counsel in this case. After many attempts that lacked adequate proof of Plaintiff's own efforts to recruit counsel, the Court concluded with Plaintiff's sixth motion (Doc. 163), that Plaintiff had adequately demonstrated efforts to recruit his own counsel. (Doc. 166). Nevertheless, the Court stressed that counsel is a limited resource in this District and that Plaintiff's motion did not yet contain enough specificity about the reasons why he believed he needed assistance in this case. (Doc. 166). The Court also acknowledged that Plaintiff did a relatively good job representing his own interests in the case, participating actively in motion practice, and it indicated that he would receive detailed information about how to format his response to any motion for summary judgment. (Doc. 166). Thus, Plaintiff's sixth motion was denied with the mandate that if he desired counsel in the future, he would need to shed more light on the tasks posing specific difficulty to self-representation. (*Id.*).

Plaintiff's seventh motion (Doc. 200) was cross-filed in eight different civil cases. It briefly states that Plaintiff needs assistance in this case to respond to pending motions and to handle discovery issues, but by the time the motion was filed Plaintiff had already filed responses to summary judgment. It is noteworthy that Plaintiff's formatting of his responses tracked quite closely with requirements provided by the Court's local rules for responding to summary judgment. Plaintiff also argues other pending cases are causing a mental toll on him, there is ongoing retaliation and harassment, and his conditions of confinement are disagreeable. The seventh motion does not meet the requirements the Court set forth in the thorough analysis of the sixth motion. (Doc. 166). Notably, Plaintiff has not highlighted specific issues that he cannot accomplish without assistance, and to the contrary, he has capably accomplished a remarkable amount of work in this case on his own. While Plaintiff may not be a trained attorney, from a technical standpoint, he represented himself well in this case. He filed many motions, amended his complaint, pursued an interlocutory appeal about his desire for a preliminary injunction, and filed properly formatted responses to summary judgment. These are not the actions of someone who is not able to adequately represent his own interests. Therefore, the Court finds it appropriate to deny Plaintiff's seventh motion for recruitment of counsel.

Finally, on July 27, 2026, Plaintiff filed a Motion for a Temporary Restraining Order or Preliminary Injunction (Doc. 202). As the Court has repeatedly explained to Plaintiff in this litigation, injunctive relief is only potentially appropriate where it is linked to pending claims and parties in the lawsuit. The above-captioned lawsuit concerns alleged excessive force by Defendant Hunter in June of 2022 at Shawnee Correctional Center, an

alleged denial of medical care by Defendant Bradford, and alleged retaliation by Bradford and Hunter for earlier grievance activity at Shawnee. The lawsuit also concerns deliberate indifference by Defendants Korschgen and O'Neal. By contrast, Plaintiff's latest motion (Doc. 202) discusses interactions at Pinckneyville with individuals who are not parties to this lawsuit. Plaintiff alleges that the actors threatened him to drop litigation or grievances, but he does not specifically reference the above-captioned case or mention any of the four defendants named in this case. As such, injunctive relief in this case is not appropriate because the contents of the motion and the demand for relief have no link to the operative claims or parties.

In summary, the Motions at documents 168, 171, 185, 188, 197, 200, and 202 are **DENIED**, and the Motions at documents 169, 174, 187, and 191 are **GRANTED**.

## Motions for Summary Judgment

A. Overview

Defendants Korschgen and O'Neal, the nurses who allegedly denied medical care on June 22, 2022, filed a joint motion for summary judgment. (Docs. 175, 176). Defendant Bradford filed his own motion for summary judgment. (Doc. 186). The motions are supported by medical records (Docs 176-3, 176-4), Plaintiff's deposition (Doc. 186-1), Plaintiff's response to several interrogatories (Doc. 176-7), incident report documents about June 22, 2022 (Doc. 176-5), the handheld video recording of Plaintiff's June 22, 2022, cell extraction by Defendant Bradford (Doc. 186-5, 4 minute 53 second video on a USB drive in the Court's evidence file), and still photographs from the handheld recording (Doc. 176-6). Defendant Hunter is still on military leave and thus has not been served

and has not participated in this litigation. As explained in the following analysis, the motions for summary judgment (Docs. 175, 186) will be granted in full, but the claims against Defendant Hunter shall remain active in this case and the case will be stayed until Hunter can appear and defend the merits of the claims against him.

B. Findings of Fact[1]

On June 22, 2022, Plaintiff had some sort of verbal or physical altercation with Defendant Hunter while detained at Shawnee Correctional Center. Hunter's report from the incident indicates that when Hunter attempted to place another inmate in Plaintiff's cell, Plaintiff came towards Hunter in an attempt to exit the cell. (Doc. 176-5 at 2). Hunter wrote that Plaintiff was physically pushing him, and that he warned Plaintiff if the pushing did not stop pepper spray would be deployed. (*Id.*). Hunter wrote that Plaintiff then approached with closed fists, so Hunter deployed a short burst of pepper spray to Plaintiff's face. (*Id.*). Plaintiff receded, the cell door was secured, and the chain of command was notified. (*Id.*). Hunter's report was dated 12p.m. on June 22, 2022. (*Id.*).

By contrast, Plaintiff testified that Hunter called him to the front of the cell where Hunter "kicked [him] and sprayed [him]." (Pltf. Dep., Doc. 186-1 at 18:1-4). He further alleges that when he bent down Hunter slammed the door and "busted the whole side of

[1] The parties are not in complete agreement about certain facts, so where there are diverging views, the Court points out both versions of events. As a pro se litigant, Plaintiff did his best to follow the Local Rules concerning the formatting of his responses to the defendants' statements of material fact. Plaintiff did a good job addressing each numbered factual assertion, but where he lodged objections it was not always clear what the basis was for his objection or what supporting evidence he had other than his own declarations. Each response to summary judgment had a short section labeled as a sworn declaration, so the Court treated the assertions in those sections as Plaintiff's own verified evidence of what he would testify to at trial. There are some additional extraneous factual assertions both in Plaintiff's objections and in his statements of additional material fact that were not necessarily directly supported by his sworn declarations. Ultimately, the discrepancies do not drive the outcome in this case, so the Court need not highlight these individual issues at length.

[his] head on the door." (*Id.*, 19:15-17). Plaintiff further testified, "if you seen the handheld video, you can see the blood coming from my head." (*Id.*, 46:10-12). Defendants Korschgen and O'Neal posit in their statement of material facts that there is no bleeding injury to Plaintiff's head depicted in the video footage, and they tendered still images with Plaintiff's head clearly visible. (Def. SUMF, Doc. 176 at ¶ 10; Doc. 176-7, Exhibit F). Defendant Bradford submitted the handheld video footage for the Court to view, and the video does not depict blood. In opposition to Korschgen and O'Neal's statement of material fact, Plaintiff posited that he used the "first bloody t-shirt he had on took it off to at least stop the bleeding from the cut in my head[… and] put on a fresh t-shirt." (Doc. 184 at p. 2 ¶ 10).

After the initial interaction with Defendant Hunter, an officer approached Plaintiff's cell with a handheld camera and began recording. (Doc. 186-5, video recording in Court' evidence file). The Court reviewed the entire 4 minute and 53 second video. At about 30 seconds into the video, the viewer can see a sink and toilet in the lower left corner of the screen inside of Plaintiff's cell. Plaintiff was sitting on his bunk when the video commenced. The video continued for a few minutes with Plaintiff seated calmly on the bottom bunk. Defendant Bradford arrived at the cell front about 2 minutes and 20 seconds into the recording, announced that he was there to de-escalate the situation, and asked Plaintiff to cuff up. Plaintiff turned his back to the cell door and Bradford reached through the small rectangular port in the door to apply handcuffs. As Bradford is attempting to cuff the second wrist, Plaintiff complained about the manner the cuffs were being applied, and Bradford directed Plaintiff to move his arm closer to the door. Plaintiff

was successfully cuffed without further incident, and Bradford and the videographer walked Plaintiff to an enclosed cell, with Bradford providing audible directions about where to walk along the way. Plaintiff made several remarks during the walk, indicating everyone would "read about it" and inquiring how many more years he would be kept locked up. Bradford directed Plaintiff to remove his clothes so he could wash up, and Plaintiff began to remove his clothing before the video ended. Plaintiff did not say anything about injuries, though he said he needed to talk to his lawyer.

In response to summary judgment, Plaintiff submitted a declaration wherein he states that the video evidence was altered or spoiled because it did not contain audio during the walk. (Doc. 190 at 9). Plaintiff alleges that during the walk Bradford threatened him about his litigation activity. (*Id.*). At his deposition, Plaintiff alleged he heard unidentified individuals outside his cell talking about his litigation history and how he would learn a lesson. (Doc. 186-1 at 64-65).

The parties agree that on June 22, 2022, Defendants O'Neal and Korschgen visited Plaintiff after the incident with Hunter, and it appears the visit took place at the segregation shower. Plaintiff testified that with the lingering impacts of the chemical spray, his vision was blurry, and he could barely see the two females from medical that came to see him. (Pltf. Dep., Doc. 186-1 at 23:8-10; 24:17-20). He testified that one told him he was a staff-assaulter who filed lawsuits, and the other said nothing. (*Id.*, 23:10-13). At the deposition, Plaintiff was presented with a series of medical refusal forms, including a form signed by Korschgen and O'Neal indicating that he refused OC

decontamination on June 22, 2022, but he claimed "they did that themselves. I didn't do nothing. I wanted the help." (*Id.* 28:14-16).

Defendants Korschgen and O'Neal tendered medical refusal forms indicating that Plaintiff refused OC decontamination on June 22, 2022, around 1p.m. (Doc. 176-3 at 136), he was advised he had fasting labs the next day at 6p.m. on June 22, 2022 (Doc. 176-4 at 5), and he refused evening medications on June 22, 2022 (Doc. 176-3 at 137). There are also refusal forms for the labs on June 23, 2022 (Doc. 176-3 at 138), and for his morning medications on June 23, 2022 (Doc. 176-3 at 139). In addition to the medical contacts, Korschgen and O'Neal indicate that Plaintiff was seen by a mental health provider for an evaluation of suicide potential and for a mental assessment performed upon admission to restrictive housing on June 22, 2022. (Doc. 176-4 at 124-128). The provider, C. Sandusky, recorded that Plaintiff had no deterioration in appearance, hygiene, or self-care, no apparent mental disorder, and no observed or reported symptoms of major disorders like depression or suicidality. (*Id.* at 128). The form contained check boxes for mental health referrals or medical referrals, but Sandusky checked a box to make no referral. (*Id.*). Additionally, Defendants indicate that on June 22, 2022, Plaintiff was provided with mental health group counseling materials from mental health provider C. Kwiatkowski, who noted Plaintiff was not in distress, he was groomed and had appropriate hygiene, and he was calm and mannered. (Doc. 176-4 at 122-23). Kwiatkowski noted a similar interaction the next day. (Doc. 176-4 at 129-30). By contrast, on June 25, 2022, Plaintiff refused to participate in a session to update his master treatment plan with Sandusky and Dr. Burkhartzmeyer. (Doc. 176-4 at 131-139).

Plaintiff contends by declaration in his response to Korschgen and O'Neal's statement of material facts that he did not refuse treatment on June 22, 2022, and the refusal form was signed by staff without him ever being consulted. (Doc. 184 at 11-12). Plaintiff tendered an excerpt of the prison's handbook that indicates an inmate *may* be disciplined for refusing medical services and that inmates are expected to sign a refusal form. (Doc. 184 at 15). Plaintiff claims in his statement of additional material facts that medical staff did not follow the policy because they did not ask him to sign and did not discipline him for failing to sign. (Plaintiff's Additional SUMF, Doc. 184 at p. 5 ¶¶ 1-3).

C. Legal Standards

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted). Courts generally cannot resolve factual disputes on a motion for summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted). However, a non-movant must do more than rest upon the allegations made in the complaint to withstand summary judgment. *See e.g., Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("[T]o withstand summary judgment, the non-movant ... may not rely on vague, conclusory allegations."); *see also,*

*Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion.").

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See* *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citation omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750; *accord*, *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The second consideration is if the prisoner has demonstrated subjective indifference to his situation.

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See* *Greeno*, 414 F.3d at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

In addition to refusing treatment or providing treatment that is inadequate, a prison medical provider may also be liable for deliberate indifference based on allegations that they needlessly delayed treatment. To demonstrate that a delay caused a cognizable injury, an inmate must show that the delay either exacerbated his injury *or* that it unnecessarily prolonged the pain. *Thomas v. Martija*, 991 F.3d 763, 771 (7th Cir.

2021). In cases where prison officials delayed rather than denied treatment, the plaintiff must offer verifying medical evidence that the delay (rather than the underlying condition) caused some degree of harm. *Id.* at 749, *citing* *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013).

A successful claim for First Amendment retaliation requires that a plaintiff show, "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). "To make a prima facie showing of causation the plaintiff must show only that the defendant's conduct was a sufficient condition of the plaintiff's injury." *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011). Then the burden shifts to the defendant to rebut plaintiff's prima facie showing by establishing that "his conduct was not a necessary condition of the harm—the harm would have occurred anyway." *Id.*

An inmate may meet the *prima facie* showing by offering direct or circumstantial evidence that the defendant's actions were motivated by retaliation. *See e.g.*, *Kidwell v. Eisenhauer*, 679 F.3d 957, 965-66 (7th Cir. 2012). "Circumstantial evidence, however, is evidence from which a trier of fact may infer that retaliation occurred. 'Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other [individuals] in the protected group.'" *Id.* Inmates retain a First Amendment right to complain about prison staff, whether orally

or in writing, but only in ways consistent with their status as prisoners. *See Turner v. Safley*, 482 U.S. 78, 89–90 (1987). However, name calling, backtalk, or arguments are not protected speech. *See e.g.*, *Caffey v. Maue*, 679 Fed. App'x 487, 490-91 (7th Cir. 2017); *Kervin v. Barnes*, 787 F.3d 833, 834 (7th Cir. 2015) (finding an inmate engaged in unprotected backtalk when he insisted on talking to a lawyer after a guard said no).

D. Korschgen and O'Neal's Motion

Korschgen and O'Neal primarily argue that they should not be held responsible for deliberate indifference because they offered Plaintiff care on June 22, 2022, and he simply refused to accept. Alternatively, they argue that they cannot be responsible for refusing or delaying care because Plaintiff has not provided any evidence that his eyes or mental health[2] deteriorated *because of* the incident on June 22, 2022. Plaintiff counters that the decontamination form was fabricated as a cover-up for the lack of care, and that it did not comply with prison policy because he did not sign it. (Doc. 184 at 7). Plaintiff argues he is not obligated to demonstrate a lasting injury or harm and only needed to establish that he had pain on June 22, 2022.

There is a material dispute about the veracity of the refusal form, which, if truthful, would dispose of Plaintiff's claim against Defendants Korschgen and O'Neal by

[2] The Amended Complaint (Doc. 15) did not mention a decline in Plaintiff's mental health, and upon initial review the Court did not designate a claim to proceed concerning deliberate indifference to Plaintiff's mental health (Doc. 16 at 3-4). It seems that Defendants Korschgen and O'Neal simply wrapped mental health care into their analysis of this case because in response to an interrogatory, Plaintiff indicated he suffered ill-effects to his mental health. (Doc. 176-7 at p. 3 ¶ 3) (the interrogatory called for a list of injuries from the alleged constitutional deprivation, and Plaintiff alleged he had blurred vision, dry eyes, pain, depression, nightmares, and a number of medications). This passing mention during discovery is insufficient to make treatment of Plaintiff's mental health an operative claim, so the Court will not substantively analyze the sufficiency of mental health further.

establishing that they offered care. Form aside, the Court will still analyze if Plaintiff presented to Korschgen and O'Neal with a serious medical need warranting treatment. Defendants Korschgen and O'Neal seem to assume that pepper spray in Plaintiff's eyes would constitute a serious medical condition, instead arguing that he suffered no lasting damage. However, the Court is not convinced that when Korschgen and O'Neal saw Plaintiff after 1p.m. on June 22, 2022, he was actually exhibiting symptoms of a serious medical need.

The Seventh Circuit concluded in an unpublished decision that making an inmate wait to wash up from pepper spray for 10-20 minutes while he calmed down could not establish deliberate indifference, but the Court noted that making an inmate wait significantly longer could potentially amount to deliberate indifference. *Kervin v. Barnes*, 144 Fed. App'x 551, 552 (7th Cir. 2005). In the years since *Kervin*, many courts have considered if leaving an inmate without an ability to wash-up from mace exposure amounts to a serious medical need for purposes of the Eighth Amendment. In *McCloud v. Vanschoyck*, 2024 WL 229740 (S.D. Ind. Jan 19, 2024), a district court concluded that an inmate could proceed on an Eighth Amendment deliberate indifference claim against several prison employees on the premise that he asked them to decontaminate from mace but was not allowed to decontaminate for approximately three days.

By contrast, in *Hughes v. Durrent*, 2017 WL 3978702 at *10 (N.D. Ill. Sept. 11, 2017), a court noted that numerous courts in the Seventh Circuit have concluded that exposure to pepper spray, and the lingering effects, do not equate to a serious medical condition for purposes of deliberate indifference. The *Hughes* Court found that a doctor was not

deliberately indifferent to mace exposure when the doctor never saw the inmate and believed he had an opportunity to wash up. *Id.* at * 11. By contrast, the *Hughes* Court found that an Eighth Amendment claim could proceed beyond summary judgment against a guard who knew the inmate had not had a chance to wash up, and whom the inmate allegedly begged to be allowed to wash up.

In *Coy v. Yarber*, a court concluded that an inmate could not proceed on a claim for a serious medical issue where he had an adverse reaction to second hand pepper spray and had a sink in his cell to wash up. 2025 WL 2782829 (S.D. Ind. Sept. 30, 2025). By contrast, in *Daniels v. Downs*, 2023 WL 5431757 (S.D. Ind. Aug. 23, 2023), a court allowed a claim to proceed beyond summary judgment against a guard who allegedly sprayed a plaintiff in the face with OC spray and did not offer any opportunity for decontamination for hours. The *Daniels* court suggested that the key difference between it finding a serious medical condition and other courts that concluded pepper spray did not create a serious condition was that the inmate had no opportunity to clean up from the effects of the chemical agent.

Ultimately in this case, the Court is not persuaded that Plaintiff presented to Korschgen and O'Neal with a serious medical condition. Key to this holding is Plaintiff's statements in response to summary judgment, the timeline of events, and an objective review of the video footage. The documentary evidence establishes that Hunter sprayed Plaintiff with pepper spray at noon on June 22, 2022, and then he secured the door of Plaintiff's original cell. Plaintiff alleges that in the altercation with Hunter, he was sprayed in the face *and* sustained a cut on his forehead above his eye that visibly bled.

Defendants Korschgen and O'Neal argue and establish with still images and with the video footage that no cut or blood was visible on Plaintiff's face when the handheld video started. The documentary evidence establishes that the handheld video began around 1p.m. on June 22, 2022, almost an hour after the scuffle with Hunter. During this time, Plaintiff simply explains in response to summary judgment that you could not see blood on his face because he used a dirty bloody shirt to clean up before Bradford or the camera man arrived. This assertion may well be true, but if Plaintiff was able to wash a cut and stop the bleeding, it is simply not plausible that he would not also have cleaned the pepper spray from his face.

When the camera begins recording, Plaintiff can be seen inside his cell with no visible injuries or distress sitting on a bunk next to a sink. He is not squinting, rubbing at his eyes, or audibly complaining to the officer recording that he needs to wash up. When Bradford arrives, Plaintiff complains about the manner the handcuffs were applied, but he does not complain of blurry vision, burning eyes, or anything of the sort. As Plaintiff is escorted out of the cell and to the holding shower there is no visible distress and the encounter appears relatively calm. Plaintiff is never heard on camera begging to wash up or indicating he has not yet had a chance to do so. The only verbal request that Plaintiff made to Bradford on camera was to contact his lawyer. While credibility determinations are disfavored at summary judgment, a court can disbelieve the non-movant's presentation of the facts if the video evidence utterly discredits that rendition of the facts. *Raddant v. Douglas Cnty., Wisconsin*, 170 F.4th 583, 591 (7th Cir. 2026). Here, the Court finds that the video evidence utterly discredits Plaintiff's position that he had

a serious medical condition for which Korscghen and O'Neal refused treatment. Plaintiff had approximately an hour between the pepper spray from Hunter and when Bradford escorted him and he was seen by Korschgen and O'Neal. If Plaintiff cleaned his forehead cut as he suggests, it is implausible that he did not also clean his eyes. Thus, this is not a case where Plaintiff was left to languish restrained or unable to address his eye pain for any length of time. Regardless of if Korschgen and O'Neal offered decontamination, at most Plaintiff had minor lingering effects by the time he saw them, and not a serious medical condition.

Korschgen and O'Neal also argue at length that Plaintiff did not provide verifying medical evidence that their actions caused his condition to worsen or caused prolonged pain. The medical records they submitted demonstrate that more than two weeks after June 22, 2022, Plaintiff was seen and treated for minor eye irritation and received eye drops. (Doc. 176-4 at 11-12). They also tendered records indicating that on December 3, 2022, Plaintiff was seen by an eye doctor who concluded he had no damage to his eyes. (Doc. 176-4 at 57, 213). Though Plaintiff technically objected to the Defendants' assertion that these records establish no long-term injury, he did not proffer any credible evidence to support his objections. The unrefuted medical records clearly establish that Plaintiff did not suffer a worsening of his condition due to any delay in treatment allegedly caused by Korschgen or O'Neal. Though Plaintiff contends that Korschgen and O'Neal prolonged his suffering, the video flatly contradicts that assertion as Plaintiff neither displayed nor expressed signs of prolonged suffering on camera. Thus, Defendants Korschgen and O'Neal are entitled to summary judgment.

E. Bradford's Motion

Defendant Bradford argues that he is entitled to summary judgment because he did not deny Plaintiff access to medical care, and the video evidence contradicts any argument to the contrary. As the Court noted with Korschgen and O'Neal, the video evidence does not depict any serious medical need. Plaintiff did not tell Bradford he needed medical care and it was not visibly obvious what ailed Plaintiff. Additionally, it is significant to note that in the video Bradford shuts the cell door and tells Plaintiff to strip down so he can wash up. Though Plaintiff argues that Bradford knowingly placed him a shower without running water, he waivered at his deposition about whether Bradford or another officer was responsible for turning on the water. Even if Bradford placed him in a shower without running water, Bradford did not observe a serious medical need and medical personnel reported to the cell right after Bradford left. On the whole, this series of events cannot support a finding of deliberate indifference against Bradford.

In addition to the Eighth Amendment claim, Plaintiff also faults Bradford for retaliating against him. Plaintiff claimed in the amended complaint (Doc. 14) that once Bradford placed him in the shower Bradford angrily informed him that he would learn a lesson about filing grievances and lawsuits, or he would be beaten. (Doc. 14 at 7). Plaintiff did not provide testimony consistent with this assertion at his deposition. At best, Plaintiff provided vague testimony theorizing that there were staff members he could not see outside the areas he was held on June 22, 2022, that talked about his lawsuits and grievances and indicated he would learn a lesson. (Doc. 186-1 at 64:6-65:4).

Plaintiff alleges that the conduct on June 22, 2022, was retaliation for prior lawsuits and grievances. At the complaint stage, his bare assertions were enough for this claim to proceed, but at summary judgment, the non-movant cannot simply rely on the allegations in the complaint. At this point, Plaintiff has not developed the circumstantial evidence to support a plausible link between his prior litigation and Bradford's actions on June 22, 2022. Plaintiff states in a declaration in opposition to summary judgment that the audio was turned off or altered on the handheld camera, and thus the viewer cannot hear the threats Bradford made about Plaintiff's litigation activity on the walk to segregation. (Doc. 190 at 9). Plaintiff's declaration is contradicted by the handheld video, which has audio during the entire walk, during which Bradford can be heard directing Plaintiff to head in a certain direction. The video contains no statements by Bradford before, during, or after the walk to the segregation shower about Plaintiff's litigation history. In fact, to the contrary, most of the audio heard during the walk is Plaintiff's own remarks to staff, which may be considered as alluding to future litigation. Specifically, Plaintiff was announcing to those present that they would "read about it," which could be taken to mean he would file a grievance or lawsuit against them. Even if Plaintiff had drawn some link between his prior litigation and Bradford's actions, he does not have evidence that Bradford acted in a fashion intended to cause him harm, and the video contradicts assertions that Bradford verbally harassed him or threatened him over his prior litigation or grievance activity. Thus, summary judgment is warranted in Bradford's favor on both claims against him.

**Disposition**

**IT IS HEREBY ORDERED THAT** the Motions at documents 168, 171, 185, 188, 197, 200, and 202 are **DENIED**, and the Motions at documents 169, 174, 187, and 191 are **GRANTED**.

Defendants' Korschgen and O'Neal's Motion for Summary Judgment (Doc. 175) is **GRANTED**, and Defendant Bradford's Motion for Summary Judgment (Doc. 186) is **GRANTED**. This resolves all claims against Korschgen, O'Neal, and Bradford, so they shall be **TERMINATED** and the Clerk of Court shall enter judgment in their favor at the close of this case.

Claims 1 and 3 may proceed against Defendant Hunter. The case is hereby **STAYED**, but Attorney Powell shall continue to provide updates on Hunter's availability. Mostly recently, counsel indicated Hunter was expected to be away until March of 2028. (Doc. 201). The next status update shall be filed by **November 30, 2026**. Given the lengthy nature of Hunter's absence, counsel is respectfully asked to investigate if Hunter is overseas or if he is located within the United States and may thus be able to participate remotely in these proceedings.

**IT IS SO ORDERED.**

Dated: September 8, 2026

DAVID W. DUGAN
United States District Judge